NEANDER WOLDEN v. WILLIAM DEERING and Others.[1]

August 7, 1908.

Nos. 15,546—(70).

**Defective Machine—Evidence.**

In an action to recover damages alleged to have been caused by a defect in a corn shredder machine, it is *held* that the evidence failed to establish the fact that the machine was in a defective condition when sold and delivered to the plaintiff.

**Same.**

The testimony of a witness that a machine was defective at the time of the accident and that no change had been made in the condition of the machine during the period of a year which elapsed between the time of its delivery and the accident, it appearing that other persons had operated the machine, and that it had been moved from place to place, and left standing in a barn during the winter and out of doors during part of the summer, will not sustain a verdict, as against the direct and positive evidence of several unimpeached witnesses, who personally tested the machine, to the effect that it was in proper condition when delivered and for some time thereafter.

Action in the district court for Jackson county to recover $20,000 for personal injuries alleged to have been caused by a defect in a corn shredder. Defendants Deering and Howe alone answered. At the close of the evidence the court directed a verdict in favor of defendants Lindsley and Anderson, it appearing that they were only selling agents. The case was tried before Quinn, J., and a jury which rendered a verdict in favor of plaintiff for $5,000. From an order denying a motion for judgment notwithstanding the verdict or for a new trial, defendants Deering and Howe appealed. Reversed.

1 Reported in 117 N. W. 493.

*Kerr & Fowler* and *E. T. Smith,* for appellants.
*Dunn & Carlson* and *Knox & Faber,* for respondent.

ELLIOTT, J.

The respondent, Neander Wolden, was injured while working with a corn shredder machine, and brought this action against the appellants, doing business under the name of the Deering Harvester Company, on the theory that they were responsible, because they had manufactured and sold a defective and dangerous machine. The jury returned a verdict in favor of the plaintiff, and this appeal is from an order denying the defendants' motion for judgment notwithstanding the verdict or for a new trial.

The machine on which Wolden was injured is not easy to describe without the use of the drawings and photographs which appear in the records; but, in view of the grounds upon which we place this decision, the details of the mechanism are not at this time of primary importance.

The machine is called a shredder, and is used to separate the ears of corn from the stalks. The corn is carried along a feed board which inclines slightly towards the front of the machine, and fed into and between what are called "snapping rollers." The man who is feeding stands on the footboard, with his right hand on the feeding table and his left towards the rollers. As the shock of corn comes down the feedboard, the bond is cut by the cutter and the shock delivered to the feeder, who separates the butts and raises them, so that they enter the rollers at approximately right angles. There are two pairs of these rollers, each operating separately from the other. The diameter of each roller is about three inches. The surface of the roller is rough, with projections and recesses opposite the coadjuvant projections and recesses of its mate. The result is a gripping action on whatever is inserted. These snapping rollers are uncovered, and are within the reach and exposed to the view of the feeder. Between the feeder and the rollers, as the feeder stands on the running board, is a curved iron rod, one end of which is attached to the driving pulley. The other end is kept in place by a casting and spring, which is attached to the side of the feeding box and so arranged as to throw the machine out of gear when pressure is exerted on this lever rod.

While the feeder is working he leans over this rod, and necessarily sometimes presses against it. The spring, under which one end of the rod passes, is supposed to be stiff enough to prevent this ordinary accidental pressure from throwing the machine out of gear, and yet respond promptly to vertical pressure exerted for that purpose. This device, when in proper order, is supposed to enable the feeder to protect himself from injury by instantly throwing the machine out of gear and thus stopping the rollers. Ordinarily a man falling upon the rod would throw the machine out of gear, although it does not clearly appear that the device was intended to operate automatically, without reference to the manner in which the pressure was exerted.

In order to understand the alleged defects in this particular machine it is necessary to examine in some detail the casting and spring which are attached to the side of the feed box. The spring and casting are separate pieces of iron. The casting is fastened by a screw to the board which forms the vertical side of the feed box. The lever rod, which forms a bow over which the feeder is bending as he works, extends between the casting and the spring which rests on top of it. This casting consists of a square head, which is then cut down into a thin sheet of iron (about an inch or an inch and a half wide), which extends some six or eight inches along the board. Near the end of the thin part arises a projection or hump, beyond which the casting is again thin. A steel spring, resting on the square end of the casting, extends along over the hump and then curves down to the board. The rod passes through between the casting and spring, and slides back and forth over the hump as pressure is exerted. When the machine is in gear the rod is beyond the hump. Vertical pressure on the top of the rod forces it over the hump into the space next to the square end of the casting, and throws the machine out of gear. The closer the spring is forced down on or near to the hump, the more pressure is required to force the rod over the hump. Less pressure is required when the rod passes through the opening at right angles with the casting and presses squarely against the hump than when it passes through diagonally and the pressure is exerted against one corner of the hump. This device, according to the testimony of the company's expert witness, had "two functions—one to stop the rolls, and another, if a man fell against it, he wouldn't be in so much danger."

Some time in November, 1901, the respondent, Neander Wolden, and his brother Henry, purchased one of these machines from the Deering Harvester Company. Neander took no part in the operation of the machine during the first season. A year afterwards he commenced to feed the machine, and within fifteen or twenty minutes after he commenced to work his hand was caught between the rollers and so crushed that it had to be amputated. In describing the manner in which he was injured he said: "Just as I took hold of the stalk and was feeding it came a jerk, and it just threw me off from balance, and I just fell this way, and I struck the lever; but I was not able to recover to my feet before the rollers caught my fingers, and then I dropped myself so my knees was touching the platform, and that is the way I was standing—that is the way I was hanging, trying to break the lever. * * * Then I just threw myself, and after that I got up on my feet again, and I yelled, and at the same time my brother seen it and he jumped up and reversed the engine with the steam on, and I caught hold then with this hand, caught hold of this lever down here to break it out of gear, and just as he stopped the engine then I got it out of gear. Then he stopped the engine, and then I was able to get it out of gear. I couldn't get it out before. * * * I threw myself just as hard as I could against it. * * * I struck it as hard as I fell there. * * * I was hanging on with the whole body, so I was down, clear down, on the platform. * * * It didn't take no more than two or three or four seconds."

The action was brought upon the theory that the defendants were responsible because they had manufactured and put on the market a dangerously defective and faulty machine without notifying the purchaser of the defect. Schubert v. J. R. Clark Co., 49 Minn. 331, 51 N. W. 1103, 15 L. R. A. 818, 32 Am. St. 559; 1 Thompson, Neg. (2d Ed.) §§ 820–831. In the complaint it is alleged that when the sale was made certain warranties and false representations were made by the appellant with reference to the way in which this safety device would operate. But on the trial, in response to a question from the court, it was stated that nothing was claimed by reason of these allegations and that the right to recover was rested on the fact that the mechanism was defectively and improperly constructed in the following particulars: (1) The spring which held the lever in place,

because of an air bubble or some similar defect in manufacture, was so thickened at the end where it was bolted onto the casting, and the hook at the other end of the spring was so narrow, that the unusual and improper pressure and increased tension of the lever against the spring which resulted from the presence of the bubble, improperly tightened the spring against the hump on the casting and prevented the lever from operating; and (2) that the spring and casting were attached to the feedboard at a wrong angle. By reason of these defects, and the further fact that the machine was so constructed that the natural pressure exerted by the operator against the lever, as it stood between him and the rolls, made it more difficult to throw the lever downwards, it was claimed that the safety lever refused to respond when the respondent threw his weight upon it, and as a result his hand was caught in the roller and crushed.

The court submitted the case to the jury with instructions that the plaintiff could not recover unless it appeared from the evidence that the injury was occasioned by and as a result of the safety lever failing to respond promptly to a reasonable pressure by the arm or body on the safety lever, and that the failure to respond was occasioned by the defective condition in question as claimed, and that such condition was so hidden and concealed that Wolden with reasonable care and prudence on his part could not have ascertained and detected the same. The jury was also instructed that such defective condition must have existed and been known to the defendants at the time when they sold the machine to the Wolden brothers.

The appellants contend that there was no evidence to show negligence on their part in the manufacture or equipment of the machine, it not appearing that the shredder was not made according to the best methods known at the time of its sale, or that the machine at the time of the accident was in the same condition that it was in when sold and delivered to respondents; that the evidence shows affirmatively that the machine was perfectly safe when properly adjusted and operated; that the lever was adjustable, and that if it did not work freely enough the condition could have been remedied by merely loosening the nut on the bolt which fastened the spring on the bar; and that the respondent was guilty of operating the shredder the sec-

ond season without examining it and acquainting himself with its condition and testing the lever to see whether it was properly adjusted.

The evidence offered by the plaintiff to show that the safety device was in a defective condition was far from satisfactory. The respondent himself knew nothing about its condition. Henry Wolden testified that some time after the accident he examined the device, and discovered that the casting was then fastened to the side of the feedboard at an improper angle, and that there was a bubble in the under side of the end of the spring, which caused the spring, when screwed down tight, as it then was, to press upon the hump in the casting and render it practically impossible to throw the machine out of gear by pressure on the rod. In attempting to operate it he broke the spring. The pieces were not preserved, and the exact condition of the mechanism could only be shown by the witness' statement of what he had observed five years prior to the time of the trial. There was some real evidence showing the angle at which the casting was placed on the feedboard, but the models and photographs used in evidence were of machines and devices which resembled, but were not identically like, the one on which Wolden was injured.

But, if it be conceded that the evidence was sufficient to make an issue for the jury, the plaintiff failed to prove that the defective condition which existed after the accident existed when the machine was sold to the Woldens. It is true that Henry Wolden testified that there had been no change in the machine; but he also testified that he had never paid any attention to the matter, and never examined the device or attempted to operate the appliance. Several persons other than Henry Wolden had operated the machine during the season of 1901. During the winter it stood in the barn. In the spring it was taken out of doors and left apparently unprotected. It was hauled about from place to place, and the opportunities for changes and accidents were innumerable. Henry Wolden's testimony shows that he knew nothing about the condition of the appliance. His statement is a mere conclusion, which means no more than that, so far as his knowledge extended, no changes had been made. His purpose, when testifying, evidently was to convey the idea that he had given no attention to the safety device.

He says that he was present when the machine was delivered on the Wolden farm, and that "they put on a few parts. I don't know just what parts they did put on; but they did put in some few parts —the feed table and such things. * * * Q. Did you know anything about this safety device and how it worked before Neander was hurt? A. I hadn't never tried it. Q. You never tested it? A. I never thought of it as being a dangerous machine with that thing on there." He knew the safety lever was there, but "was not much interested in it." When asked if he saw the expert show any person how the lever worked, he answered: "No, I never seen how; that is, I never seen him throw it out of gear, or anything. Q. Is it not a fact that in your presence that day this lever here was worked several times? A. Not that I can say. Q. Will you swear that it was not? A. I say I will swear that— Q. That you don't remember it? A. No; I don't remember it. Q. But you won't swear that it was not, will you? A. No; I won't swear— * * * I never noticed the thing thrown out of gear, or the condition of it. Q. Not at all? A. Not that I remember."

It thus appears from Henry Wolden's own testimony that prior to the time his brother was injured he never tried the safety device to see if it would work, and that he never saw any one else try to work it. He ignored the whole matter, and rested upon the assurance of the agent that it would protect the operator from injury. Necessarily, then, he knew nothing about the mechanism by which it was operated, or the way in which it was constructed and fastened to the side of the feedboard.

On the other hand, there is abundant evidence to show that the safety device was in good working condition when the machine was delivered to the Woldens in the fall of 1901. In the fall of 1900 the appellants, who had not formerly manufactured any kind of shredders, had the engineer, Pitkins, make an investigation of the different kinds of machines then on the market, and as a result of his investigation they purchased the right to use this lever. In the opinion of the engineer it "was better than any other form on the market." They began its manufacture in July, 1901. The witness Stemman, who was the general inspector for the appellants, testified that all material was inspected immediately after it was purchased and before it was used,

and before it was used anything that was defective was rejected. After being manufactured each article was inspected. Each machine was set up in the factory, inspected, and tested, and no machine was allowed to go out of the factory without being tested and found all right.

The witness Field, who was an expert in the employ of the appellants, set up the shredder in question on Wolden's farm in November, 1901. He testified that the machine would be thrown out of gear whenever any pressure came on top of the lever; that this frequently happened on that day, when his arm happened to strike it a little heavily when feeding; and that he then tightened the nut, so as to increase the pressure on the rod and prevent the machine from getting continually out of gear. After doing this the lever did not respond quite so readily; but he operated it by pressing his arm or throwing the weight of his body on the top of the lever. Unless the testimony of this witness was wilfully false, this safety device was in proper condition when the machine was delivered to Wolden.

The witness Anderson, who ran the engine which furnished the power for the shredder when it was started in the fall of 1901, testified that he threw the machine out of gear by the use of the lever, and that a few days before it had been stopped by Henry Wolden's coming accidentally in contact with the lever. Anderson was experimenting to see how it worked.

The witness Betlock, who saw the machine on the Wolden farm during the fall of 1901, and who "helped feed a little and hauled bundles," tried the lever and threw the machine out of gear. He testified as follows: "Q. Just tell the jury what you did, and what was the result of it. A. Well, all I did was to put my hands on it, to try to see if it would go down, and it went down. As far as I understood, it went out of gear at that time. Q. Did you put it back into gear? A. Yes, sir. Q. By doing what? A. By pulling up on the lever. Q. And then did you proceed feeding after that? A. Yes, sir. Q. Did you try it once, or more than once? A. Tried it more than once." This may have occurred in the fall of 1902, although Henry Wolden says it was during the first season. The witness Wiger, who saw the machine set up, says that he paid no attention to the lever at that time, but later on 'in the season he worked on the machine as a cutter, and

testified that it then went out of gear accidentally, and thereafter he threw it out of gear whenever the machine became clogged.

This evidence is practically uncontroverted, and is of so direct and positive a character that it cannot be overthrown by the mere statement of Henry Wolden that no change had been made in the condition of the machine between the time of its delivery and the accident. The plaintiff failed to prove that the machine was defective when it was delivered, and the motion for a directed verdict should have been granted.

The order of the trial court is therefore reversed, with directions to enter judgment in favor of the defendants.